1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3  UNITED STATES OF AMERICA,        :
                                    :
4       v.                          :       Criminal No. 04-36 Erie
                                    :
5  JEFFREY SCOTT ARTELLO            :

6

7

8

9

10          Sentencing in the above-captioned matter held

11      on Thursday, June 16, 2005, commencing at

12      at 2:19 p.m., before the Honorable Sean J.

13      McLaughlin, at the United States Courthouse,

14      Courtroom C, 617 State Street, Erie, PA 16501.

15

16

17

18  For the United States of America:

19      Christian A. Trabold, Esquire
        Office of the United States Attorney
20
    For the Defendant:
21
        Thomas Patton, Esquire
22      Office of the Federal Public Defender

23

24

25          Reported by Janis L. Ferguson, RPR

1                              I N D E X

2

3     TESTIMONY OF TROOPER ERIC REESE

4          Direct examination by Mr. Trabold  . . . . . .     5

5          Cross-examination by Mr. Patton  . . . . . . .    13

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  This is the time for sentencing in

2     this case of United States versus Jeffrey Scott Artello,

3     Criminal No. 04-36.  We'll clear these other papers first.

4               The first matter I want to clear up for the

5     record is the Defendant had filed a position with respect to

6     sentencing factors, and the Government had filed a response.

7     And I spent some time over the weekend reading those briefs

8     and reading those cases.  And while I appreciate

9     Mr. Patton's telephone call at a quarter to 5:00 yesterday,

10    that after reading the Government's brief, he conceded a

11    point to as to save me the time, but the call came a little

12    too late.  But that's okay.

13              Is it accurate to say, Mr. Patton, that for

14    present purposes, then, you have no objection to the

15    computations made by the probation office, specifically the

16    computation that places him in a career offender status?

17         MR. PATTON:  That is correct.  We tend to ask for

18    a sentence below the range called for by the career offender

19    guidelines, but we do not object to the calculations.

20         THE COURT:  All right.  On the heels of the 5(k)

21    motion that's coming.

22         MR. PATTON:  Yes, Your Honor.  And also arguing

23    that the career offender guideline overstates the

24    seriousness of Mr. Artello's --

25         THE COURT:  And a 481.3.

1          MR. PATTON:  Correct.

2          THE COURT:  All right.  Well, then let me get this

3    out of the way first.  I'll make the following findings:

4    The total offense level applicable is 31, with a criminal

5    history category of six.  Statutory provision is custody at

6    count one, not less than five to 40 years imprisonment, and

7    count five, not more than 10 years imprisonment.  The

8    guideline provisions are 188 to 235 months.  Statutory

9    provision as to probation, not eligible at either counts one

10   and five.  Similarly, not eligible at either counts one and

11   five under the guidelines.  Statutory provision as to

12   supervised release in count one, not less than four years.

13   At count five, not more than three.  The guideline provision

14   at count one, at least four years; at count five, at least

15   two years, but not over three years.  Fine at count one,

16   $2 million per the statutory provision.  At count five,

17   $250,000, under statutory provisions.  Under the guidelines,

18   a fine of 15,000 to $2 million would apply.  Restitution is

19   inapplicable under both.  A special assessment of $100 at

20   each of counts one and five applies, both with respect to

21   the statutory provision and the guideline provision.

22              All right, Mr. Patton, what do you want to

23   tell me on the overrepresentation issue?

24          MR. PATTON:  Your Honor, as the presentence report

25   notes in Paragraph 114, Your Honor could consider that

1    Mr. Artello's classification as a career offender

2    overrepresents the seriousness of his criminal history under

3    Section 481.3.  The two convictions that qualify Mr. Artello

4    as a career offender occurred in 1980 and 1985.

5              Now, Mr. Artello became involved in this

6    conspiracy sometime around in 2000, kind of later in the

7    year of 2000.  So we are talking about offenses that

8    occurred some 20 to 15 years prior to his commission of the

9    instant offense.  And while we don't object to their being

10   counted under the guidelines -- they are properly considered

11   under the guidelines -- we do think that the age of those

12   convictions is a thing you can consider in deciding whether

13   or not the career offender guideline overrepresents the

14   seriousness of Mr. Artello's criminal history.

15             Now, I would also suggest to Your Honor that

16   to the extent that the Government is making a downward

17   motion, and if you are inclined to grant that motion,

18   whether you want to try and make a separate finding as to

19   whether there should be a downward departure under 481.3

20   versus perhaps factoring in the convictions that get

21   Mr. Artello to a career offender in the extent of your

22   departure in 5(k), it can be accomplished in that fashion.

23        THE COURT:  In other words, you're saying there's

24   two ways I can do it.  I can either utilize 481.3 as an

25   initial matter to get to a new range, and then depart from

1    there under the 5(k), or simply crank everything under the

2    rubric of the 5(k) in my consideration as to where we ought

3    to end up.

4              MR. PATTON:  Correct.  I would just point out,

5    Your Honor, that if Mr. Artello were not a career

6    offender --

7              THE COURT:  110 to 136.

8              MR. PATTON:  137.  110 to 137.  So, yes, we would

9    ask that you keep that range in consideration when you are

10   ruling on -- either on the 5(k), if you're going to roll it

11   into the 5(k).

12             THE COURT:  All right.  Is there anything your

13   client wants to say?

14             MR. PATTON:  Yes, Your Honor, he would like to

15   make a statement.

16             THE COURT:  Come on up, Mr. Artello.

17             MR. ARTELLO:  Yes, sir?

18             THE COURT:  Well, I don't have any questions for

19   you, but this is your time, if you want to say anything to

20   me before I get around to imposing sentence on you.

21                  Is there anything you want to say?

22             MR. ARTELLO:  Just that I know what I did was

23   wrong, and I accept responsibility for it, and I regret

24   doing it.  Sorry I put the Government through all the

25   trouble.

1          THE COURT:  All right.  Anything else that you

2    think would be important for me to know about you?

3          MR. ARTELLO:  I'll be 53 years old.  I will 53

4    next week.  Health is going downhill.  Arthritis.  I really

5    don't -- really have nothing too prepared to say.

6          THE COURT:  Well, that's all right.  You really

7    don't have to say anything if you don't want to.

8               All right.  Thank you very much.  You can

9    take a seat for the time being.

10          MR. TRABOLD:  Your Honor, the Government calls

11    Trooper Reese.

12          THE COURT:  Just for the record, there is a motion

13    for sentencing departure under 5(k) before me with respect

14    to this Defendant as well.  You are still under oath then,

15    Trooper.  You don't have to be sworn again.

16

17       E R I C  R E E S E, having been previously

18       sworn, testified as follows:

19

20                    DIRECT EXAMINATION

21    BY MR. TRABOLD:

22

23    Q.    Sir, where are you employed?

24    A.    Pennsylvania State Police in Erie.

25    Q.    How long have you worked there?

1        A.    21 years.

2        Q.    And you were one of the Troopers assigned to

3    investigate the Maurice Foley marijuana conspiracy?

4        A.    Yes, I was.

5        Q.    And during the course of your involvement, did you

6    come into contact with Mr. Artello?

7        A.    A number of occasions, yes.

8        Q.    Now, prior to Mr. Artello being indicted on this

9    case, he was interviewed on several occasions with regard to

10   the information he had on Maurice Foley, correct?

11       A.    Correct.

12       Q.    And those interviews stem or kind of were

13   initiated when Mr. Artello's house was searched, correct?

14       A.    Yes.

15       Q.    And subsequent to the search of his house, he

16   provided some information to the State Police.

17       A.    Yes, he did.

18       Q.    And one of the critical pieces of information that

19   he provided was information concerning a safe that Maurice

20   Foley had had delivered to Mr. Artello's house.

21       A.    Yes.

22       Q.    And he -- beyond leading the authorities to that

23   safe ultimately, prior to doing that, he provided some

24   pretty extensive details about how that safe was brought to

25   his house and by whom and what he believed to be inside it?

1    A.    Yes, he did.

2    Q.    And essentially what Mr. Artello informed the

3    State Police was that when Maurice Foley was arrested in

4    April of 2003, arrangements were made by Mr. Foley to

5    transport a significant amount of his personal property to

6    Mr. Artello's house so that law enforcement would not catch

7    up with it.

8    A.    Correct.

9    Q.    And one of those large pieces of property that

10   Mr. Foley had arrangements made to bring to Mr. Artello's

11   house was a safe.

12   A.    Yes.

13   Q.    And that safe was brought to Mr. Artello's house

14   by John Kirkpatrick.

15   A.    Yes.

16   Q.    And Mr. Artello stored it at his residence for a

17   period of time.

18   A.    Correct.

19   Q.    He then took steps to distance himself from the

20   safe by driving it to a wooded area and discarding it on the

21   side of the road.

22   A.    Yes.

23   Q.    Mr. Artello, during the course of his questioning,

24   ultimately agreed to lead the State Police to the location

25   where he had discarded the safe.

1      A.   Yes.  Me personally.

2      Q.   I'm sorry?

3      A.   Me personally he took.

4      Q.   So you and he went to that location, and he

5  pointed it out, and the safe was still there.

6      A.   Yes.

7      Q.   Under a tarp?

8      A.   Yes.  The other officers followed us.

9      Q.   And once he pinpointed the location of the safe, a

10  search warrant was obtained and executed on the safe,

11  resulting in the seizure of approximately 30 pounds of

12  marijuana.

13      A.   I believe that's right, yes.

14      Q.   And all of this was done prior to the time when

15  Mr. Artello had been charged with anything.

16      A.   Correct.

17      Q.   Now, subsequent to Mr. Artello being indicted, he

18  agreed to cooperate against Mr. Foley and against any of the

19  other co-defendants.

20      A.   Yes.

21      Q.   And is it fair to say that Mr. Artello provided a

22  substantial amount of information?

23      A.   Yes, he did.

24      Q.   And he came forward pretty quickly upon being

25  indicted to provide that information?

1        A.    I believe so, yes.

2        Q.    And you would consider the information that he

3    provided -- number one, the information was timely, and he

4    came forward in a timely fashion.

5        A.    Yes.

6        Q.    And would it be fair to say that in terms of

7    information provided about Mr. Foley's operation, no -- no

8    other indicted co-defendant provided information as

9    substantial as Mr. Artello?

10       A.    I would agree with that, yes.

11       Q.    And he provided specific highly incriminating

12   pieces of information about Mr. Foley, correct?

13       A.    Yes.

14       Q.    One of those being that during the course of this

15   conspiracy, Maurice Foley brought to his house several

16   hundred pounds of marijuana and stored it at Mr. Artello's

17   house for a very brief period of time; at the most, several

18   days.

19       A.    Right.

20       Q.    Another piece of information that Mr. Artello

21   provided was that he himself personally witnessed Maurice

22   Foley hiding several hundred thousand dollars in a rental

23   vehicle which Mr. Foley was then going to drive to

24   California.

25       A.    Right.

1      Q.   And he generally indicated that Mr. Foley was

2  hiding that -- that money underneath the -- the term escapes

3  me, but underneath the windshield wiper apparatus?

4      A.   The Callaway.

5      Q.   He also provided information that he had received

6  somewhere in the neighborhood of 35 to 50 pounds of

7  marijuana from Mr. Foley and then distributed it, correct?

8      A.   Yes.

9      Q.   Now, with regard to methamphetamine, Mr. Artello

10 provided specific information with regard to Mr. Foley's

11 distribution of methamphetamine.

12     A.   Yes.

13     Q.   And one of the pieces of information that

14 Mr. Artello provided was that Maurice Foley would have the

15 methamphetamine Fed-Exed to Erie from California.

16     A.   Correct.

17     Q.   And that piece of information -- and he would have

18 the meth Fed-Exed on occasion to Mr. Artello's house.

19     A.   Correct.

20     Q.   And then Mr. Artello would take it -- take

21 delivery of it and provide it to Mr. Foley.

22     A.   Yes.

23     Q.   And that piece of information was corroborated by

24 the search warrants that were executed in this case when the

25 State Police located a Fed-Ex shipping receipt in Maurice

1    Foley's house for a package mailed to Mr. Artello.

2        A.   Yes.

3        Q.   Mr. Artello was always compliant with whatever

4    requests we made of him, correct?

5        A.   Yes, he was.

6        Q.   So much he agreed to provide certain things we

7    didn't know about, correct?

8        A.   Correct.

9        Q.   One of those would be a magazine subscription was

10   sent to Mr. Artello's residence under the name of Clarence

11   O'Day?

12       A.   Yes.

13       Q.   Had he not provided that information as well as

14   information about a few other things, no one in law

15   enforcement would have ever known about it.

16       A.   Correct.

17       Q.   Was there ever a time when you made a request to

18   Mr. Artello that he did not comply with?

19       A.   No.

20       Q.   Do you believe his information to be factually

21   accurate?

22       A.   Yes.

23       Q.   And, in fact, almost all of his information was

24   significantly corroborated by other sources of information.

25       A.   That's right.

1      Q.   Would it be fair to say that there were letters
2  found in Mr. Artello's residence from Maurice Foley?
3      A.   Yes.
4      Q.   It would also be fair to say that those letters
5  would have probably been the most damning pieces of evidence
6  against Mr. Foley in this case?
7      A.   Yes, they were.
8      Q.   And Mr. Artello was prepared to testify in detail
9  with regard to the contents of those letters.
10     A.   Yes.
11     Q.   Mr. Artello also received other letters subsequent
12  to the indictment from Mr. Foley, correct?
13     A.   Yes.
14     Q.   And those letters were along the lines of
15  requesting that Mr. Artello not continue to cooperate with
16  the Government.
17     A.   Correct.
18     Q.   And the tone of the letters -- I guess the
19  undercurrent of the letters was generally that Mr. Foley was
20  extremely worried about Mr. Artello testifying or
21  cooperating with the Government.
22     A.   Yes.
23     Q.   And there were multiple letters in that regard.
24     A.   Yes, there were.
25     Q.   And none of that ever at any point in time caused

1    Mr. Artello to waver in his cooperation.

2         A.   No.

3         Q.   And, in fact, Mr. Artello reported, and you were

4    able to confirm, that Maurice Foley called him directly on

5    the phone and -- to paraphrase, asked him not to cooperate.

6         A.   That's correct.

7         Q.   And that's one of the recorded phone calls that

8    you testified about earlier.

9         A.   Yes.

10         Q.   And none of that caused him to waver in his

11   cooperation.

12         A.   No, it didn't.

13         MR. TRABOLD:  Nothing further, Your Honor.

14         THE COURT:  All right.  Mr. Patton, do you have

15   some questions?

16

17                    CROSS-EXAMINATION

18   BY MR. PATTON:

19

20         Q.   Trooper Reese, the cooperation that Mr. Artello

21   provided regarding the safe, is it fair to say that that

22   information was very important to the Government's case

23   against John Kirkpatrick?

24         A.   Yes, it was.

25         Q.   And that without Mr. Artello's testimony about the

1    safe and Mr. Kirkpatrick's involvement with the safe, it

2    would have been -- it would have been harder for the

3    Government to try and prove that Mr. Kirkpatrick knew what

4    was in the safe?

5        A.    Yes.

6        Q.    Is it fair to say that Mr. Kirkpatrick's position

7    that he was expressing, at least to his attorney, was that

8    while he may have had some contact with the safe,

9    Mr. Kirkpatrick never knew what was inside the safe?

10       A.    Could you restate that?

11       Q.    Was Mr. Kirkpatrick's -- prior to the time he

12   decided to plead guilty, did it appear to you that

13   Mr. Kirkpatrick's trial strategy was going to try to be

14   denying having any knowledge of what was inside the safe?

15       A.    He was going to deny everything up until he

16   decided to cooperate.

17       Q.    But Mr. Artello was able to provide information

18   not only that Mr. Kirkpatrick brought the safe to

19   Mr. Artello, but that also Mr. Artello saw Mr. Kirkpatrick

20   open the safe.

21       A.    Correct.

22       Q.    And take marijuana out of the safe.

23       A.    Yes.

24       Q.    And all the cooperation with regard to the safe

25   was done before Mr. Artello was charged, correct?

1          A.    Leading us to the statement about

2    Mr. Kirkpatrick's involvement in it.

3          Q.    And he took you to the safe before he was charged

4    and had an a attorney appointed or anything like that?

5          A.    Correct, yes.

6                MR. PATTON:  Those are my questions, Your Honor.

7                THE COURT:  Thank you, sir.  You are excused.

8                     All right, Mr. Patton, anything you want to

9    tell me, or your client, before we move on?

10               MR. PATTON:  Your Honor, I would highlight the

11   fact that Trooper Reese's testimony -- Mr. Artello

12   cooperated very early and provided, even in the Trooper's

13   estimate, probably more cooperation than anyone else in the

14   case.  And I do think that that ought to play a role in Your

15   Honor's decision of the extent of the departure in this

16   case.

17               THE COURT:  All right.  Does your client have

18   anything he wants to say?

19               MR. ARTELLO:  No, Your Honor.

20               THE COURT:  Okay.

21               MR. TRABOLD:  Your Honor --

22               THE COURT:  Well, what about -- I'm sorry,

23   Mr. Trabold.  But first tell me about your position on this.

24   You know, when I am departing, it always is good to know

25   where I am departing from.  What about this 481.3?

1          MR. TRABOLD:  I do think counsel is accurate when

2     he says essentially you can kind of throw it all in the same

3     pot when you arrive at where it is that you want to go to.

4     But I don't think that his -- Mr. Artello's prior criminal

5     history is overstated in any way, because by my reading of

6     the presentence report, he has, I think, 12 prior adult

7     involvements with the criminal justice system.  Admittedly

8     the ones that make him a career offender are somewhat older,

9     but his career activity has continued on to a time period

10    relatively close to his time and involvement in the criminal

11    activity in this case.

12          I don't think that should in any way

13    diminish, though, the level of his cooperation in this case,

14    with regard to the 5(k) motion that we filed.  His

15    cooperation was, without question, substantial.  And I want

16    to note one thing that kind of really stuck with me.  It was

17    apparent to me when we first met with Mr. Artello that by

18    virtue of him having the criminal history that he has, he

19    was -- I don't want to say reluctant, because that has kind

20    of a perjurious tone to it, but he was somewhat mistrusting

21    of myself and Trooper Reese or any of the other officers

22    that dealt with him.  But over a period of time he seemed to

23    kind of put that aside and really endeavored to provide a

24    level of information that with the exception of possibly one

25    other person, I don't think any -- anybody even came close

1    to providing the amount of information that he provided in

2    this case.  There are other people that you will hear about

3    later that did a few other things with regard to other

4    matters, but Mr. Artello provided a level of information in

5    this case that in the best way I can put it to you is, in my

6    opinion, having put Mr. Artello on the witness stand and he

7    would have been the only witness against Mr. Foley, the jury

8    would have convicted Mr. Foley without any hesitancy

9    whatsoever.

10            THE COURT:  If he were the only one?

11            MR. TRABOLD:  If he was the only witness.  Part of

12    the reason I say that is five letters that Mr. Foley sent to

13    Mr. Artello.  Mr. Artello did not provide those letters to

14    the Government because they were seized during the course of

15    the execution of the search warrant.  However, he was

16    debriefed on those letters extensively, and I think would

17    have provided testimony beyond the actual plain language of

18    the letters.  I mean, the letters in and of themselves, I

19    have never seen anything like them in the 10 years I have

20    been prosecuting cases.  And I think the testimony he would

21    have provided would cause the jury to be even wondering why

22    they are even here, that's how damning those letters were.

23            I don't get the sense from Mr. Artello that

24    he was nervous about any threats or worried about Mr. Foley,

25    because he's, by virtue of what you see in the presentence

1  report, he's obviously been around for quite a while, and I

2  don't think for one second he was nervous or scared about

3  Mr. Foley.

4          However, the fact remains -- and what I

5  really want to share with the Court is the tone of the

6  letters that Mr. Foley sent to Mr. Artello post indictment

7  make it clear to me that he -- he knew very well what was

8  going to happen if Mr. Artello got on the witness stand and

9  testified against him.  And, really, he cooperated

10  extensively and was at all times willing to testify and I

11  think would have been very forthright and would have come

12  across as very credible had he testified.  Thank you.

13          THE COURT:  All right.  Just for the record, with

14  respect to the 481.3 request, having read the entire

15  presentence report, and notwithstanding the rather aging

16  nature of the two crimes, terroristic threats and indecent

17  assault, which form the predicates in part for the career

18  offender status, and they are relatively close period --

19  closeness in time and the fact that they are, I think,

20  misdemeanors, the probation report does reflect,

21  nevertheless, what in my view is a consistent pattern of

22  criminal activity.  So with Shoup's admonition that those

23  departures should be reserved for the truly unique case, I

24  just do not see this as one of them.

25          With that having been said, with respect to

1    the Government's motion for downward departure, I do find

2    that his cooperation here was substantial and timely and

3    extremely useful to the Government's case, and so that

4    motion will be granted.

5              All right.  Do you want to stand up,

6    Mr. Artello, and I'll impose sentence at this time.

7              Pursuant to the Sentencing Reform Act of

8    1984, it is the judgment of the Court -- and let me just say

9    as a preparatory matter -- and I don't even know if it's

10   necessary anymore, given how far down the road from Booker

11   we are.  But, of course, under Booker now, I well recognize

12   that the guidelines are advisory and considering the

13   calculus of those factors that are supposed to be considered

14   under the statute in imposing any sentence.

15             In any event, pursuant to the Sentencing

16   Reform Act of 1984, it is the judgment of the Court that the

17   Defendant Jeffrey Scott Artello is hereby commanded to the

18   custody of the Bureau of Prisons to be imprisoned for a term

19   of 90 months at each of counts one and five, to be served

20   concurrently.  Upon release, he shall be placed on

21   supervised release for a term of four years.  This term

22   consists of four years on count one and three years on count

23   five; all such terms to run concurrently.  Within 72 hours

24   of release from the custody of the Bureau of Prisons, the

25   Defendant shall report in person to the probation office of

1    the district in which the Defendant is released.  While on

2    supervised release, the Defendant shall commit another

3    federal, state, or local crime, shall comply with the

4    standard conditions of supervision recommended by the

5    Sentencing Commission and adopted by this Court, and shall

6    comply with the following additional conditions:  He shall

7    not illegally possess a controlled substance, shall not

8    possess a firearm or a destructive device, shall participate

9    in a program for the treatment of substance abuse, as

10   directed by the probation officer, until such time as the

11   Defendant is released from the program.

12           Further, the Defendant shall be required to

13   contribute to the cost of services for any such treatment in

14   an amount determined by the probation officer, but not to

15   exceed the actual cost.  The Defendant shall submit to one

16   drug urinalysis within 15 days after being placed on

17   supervision and at least two periodic tests thereafter.

18   Defendant shall cooperate in the collection of DNA as

19   directed by the probation officer.

20           It is further ordered that the Defendant

21   shall pay to the United States a special assessment of $200,

22   which shall be paid to the United States District Court

23   clerk forthwith.  I find the Defendant does not have the

24   ability to pay a fine, and, therefore, I will waive a fine

25   in this case.

1          Mr. Artello, subject to whatever terms and

2     conditions might appear in your plea agreement, you do have

3     the right to appeal the sentence, but if you choose to do

4     so, you must do so within 10 days.  Do you understand that?

5          MR. ARTELLO:  Yes.

6          THE COURT:  What is the Government's position on

7     self-report insofar as Mr. Artello is concerned?

8          MR. TRABOLD:  No objection.

9          MR. PATTON:  1I would like to lodge an objection

10    to the DNA.

11         THE COURT:  It's noted.

12         MR. PATTON:  It's not a requirement.  And also ask

13    that Mr. Artello be housed at FCI Elkin, which is the

14    facility that is closest to his --

15         THE COURT:  Family members.  I make that

16    recommendation on the record.  All right.  We're adjourned.

17

18         (Hearing concluded at 2:45 p.m.)

19

20

21

22

23

24

25